1  **TIMOTHY A. SCOTT**
   California Bar No. 215074
2  LAW OFFICES OF TIMOTHY A. SCOTT, APC
   1350 Columbia Street, Suite 600
3  San Diego, California 92101
   Telephone: (619) 794-0451
4  Facsimile: (619) 652-9964
   Email: tscott@timscottlaw.com
5
   Attorneys for Plaintiffs
6

7              **UNITED STATES DISTRICT COURT**

8          **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

9

10 Joanne Lewis,                        )   Civil Action No.  **'15CV2319 CAB JLB**
11                                      )
              Plaintiff,                )
12                                      )   **Complaint for Damages for:**
       v.                              )
13                                      )   1.  *Bivens:* Unlawful Detention
                                        )   2.  FTCA:  False Imprisonment
14                                      )   3.  FTCA:  Negligence
                                        )   4.  APA :  5 U.S.C. § 702, injunctive relief
15 United States; CBP Officer Amir,     )   5.  APA :  5 U.S.C. § 702, injunctive relief
   individually and in his official capacity; )   6.  *Bivens*: Illegal Search
16 CBP Officer Ramos, individually and in )   7.  FTCA:  Battery
   his official capacity; CBP Officer    )   8.  *Bivens*: Illegal Search
17 Gomez, individually and in           )   9.  FTCA:  Battery
   his official capacity; Doe CBP       )   10. FTCA:  Unlawful arrest, CCC 52.1
18 Officers 1-50, individually and in their )   11. FTCA:  Illegal search, CCC 52.1
   official capacities; San Diego County )   12. 42 U.S.C. § 1983: Illegal Arrest
19 Sheriff's Department; Doe SDCS       )   13. 42 U.S.C. § 1983: Illegal Arrest
   Deputies 1-50, individually and in their )   14. *Monell*: Unconstitutional customs,
20 official capacities; Contra Costa County )       policies, and procedures
   Sheriff's Department; CCCSD Deputy    )   15. *Monell*: Failure to train and/or supervise
21 A. Charles, individually and in his   )   16. *Monell*: Unconstitutional customs,
   official capacity; CCCSD Deputy       )       policies, and procedures
22 M. Bailey, individually and in his    )   17. *Monell*: Failure to train and/or supervise
   official capacity; Doe CCCSD          )
23 Deputies 1-50, individually and in    )
   their official capacities,            )   **Demand for Jury Trial.**
24                                       )
              Defendants.                )
25 _____   )

26

27
                                    1
28
                              COMPLAINT

# INTRODUCTION

1.      U.S. Customs and Border Protection officers arrested Plaintiff Joanne Lewis ("Plaintiff") on an outstanding warrant.  The warrant was sixteen years old.  It alleged the simple possession of narcotics.  But while the warrant was for *a* Joanne Lewis, it was not for *this* Joanne Lewis.

Plaintiff and the other Joanne Lewis do not resemble each other.  Plaintiff is a Caucasian woman.  She stands 5'2".  She weighs 120 pounds.  She is 52 years old.  She had  no criminal history.  She had never visited Contra Costa County.  She spent the day volunteering at a Tijuana orphanage before her arrest.

The warrant was for an African-American woman.  That woman stood 5'8".  That woman weighed 150 pounds.  That woman lived in Contra Costa County.  That woman failed to appear in court after her 1997 arrest for the possession of heroin.

Although the names of these two women were the same, and although Contra Costa County wrongfully included Plaintiff's driver's license number in the warrant, the birthdates were a year apart also.  Given these objective discrepancies between Plaintiff and the other Joanne Lewis, officers knew or should have known that the warrant was not for Plaintiff.  But they arrested her anyway.

And it got worse.  After the arrest, a Customs officer sexually assaulted Plaintiff.  She subjected her to repeated and illegal body-cavity searches.  Officers mocked her when she complained and wept.  When CBP finally contacted Contra Costa County about the warrant—hours later—an officer instructed CBP to continue to detain Plaintiff.  They did so even though they knew or should have known that it was not the right person.  The San Diego County Sheriff later repeated the same error that CBP did.  They ignored Plaintiff's protestations of innocence.  They ignored information that conflicted with the facts on the warrant.  They too knowingly booked and held Plaintiff on someone else's warrant.

This resulting complaint can be summarized as follows:

| Count | Claim | Defendant(s) |
|---|---|---|
| 1 | *Bivens* / Fourth Amendment claim for unlawful arrest. | Individual CBP Officers Amir, Ramos, Gomez, and CBP Does |
| 2 | Federal Tort Claims Act claim for false imprisonment. | United States |
| 3 | FTCA Claim for negligence. | United States |
| 4 | Administrative Procedures Act claim for injunctive relief regarding CBP policies and procedures for executing a warrant. | United States |
| 5 | Administrative Procedures Act claim for injunctive relief to purge Ms. Lewis's wrongful criminal history. | United States |
| 6 | *Bivens* / Fourth Amendment claim for first illegal body cavity search. | Doe CBP officer(s) |
| 7 | FTCA claim for battery for first illegal body cavity search. | United States |
| 8 | *Bivens* / Fourth Amendment claim for second illegal body cavity search. | Doe CBP officer(s) |
| 9 | FTCA for battery for second illegal body cavity search. | United States |
| 10 | Bane Act violation, Cal. Civ. Code §52.1, via the FTCA, for unlawful arrest and detention in violation of California law. | United States |
| 11 | Bane Act violation, Cal. Civ. Code §52.1, via the FTCA, for body cavity search in violation of California law. | United States |

| 12 | § 1983 / Fourth Amendment claim for illegal arrest at Los Colinas Detention Facility | Doe San Diego County Sheriff's Deputies |
|----|----|----|
| 13 | § 1983 / Fourth Amendment claim for deliberate indifference in drafting warrant, and for illegal arrest in directing CBP to continue Ms. Lewis's unlawful arrest. | Doe Contra Costa County Sheriff's Deputies, CCCSD Officers A. Charles, M. Bailey |
| 14 | Unconstitutional customs, policies or practices *(Monell,* 42 U.S.C. § 1983) for unlawful practices and procedures in executing warrants. | San Diego County Sheriff's Department |
| 15 | Unconstitutional failure to train and/or supervise (*Monell,* 42 U.S.C. § 1983) regarding practices and procedures in executing warrants. | San Diego County Sheriff's Department |
| 16 | Unconstitutional customs, policies or practices *(Monell,* 42 U.S.C. § 1983) for unlawful practices and procedures in drafting, issuing, and executing warrants. | Contra Costa County Sheriff's Department |
| 17 | Unconstitutional failure to train and/or supervise (*Monell,* 42 U.S.C. § 1983) regarding practices and procedures in drafting, issuing, and executing warrants. | Contra Costa County Sheriff's Department |

Plaintiff requests a jury trial to pursue justice on these claims.

COMPLAINT

**JURISDICTION AND VENUE**

2.      This is a civil action where jurisdiction is founded on a federal question under 28 U.S.C. § 1331.

3.      Plaintiff's claims arise in this judicial district where the events or omissions giving rise to this complaint occurred, namely the Otay Mesa Port of Entry, the San Ysidro Port of Entry, and the Las Colinas Detention Facility, all of which are situated in the Southern District of California.

4.      Venue is proper in the United States District Court for the Southern District of California under 28 U.S.C. § 1391.

5.      Plaintiff filed timely claims against the federal defendants under 28 U.S.C. §§1346, and 2671-2680 (the Federal Tort Claims Act), on or about October 31, 2014.  The United States denied the claims on or about April 28, 2015.

**PARTIES**

6.      Plaintiff was, at all times relevant to this lawsuit, a resident of the State of California, County of Orange, and a citizen of the United States.  She was traveling through the Otay Mesa Port of Entry, in the Southern District of California, on November 2, 2013.

7.      At all times relevant herein, Customs and Border Protection ("CBP") was a sub-agency of the Department of Homeland Security, which in turn is an agency of defendant United States.

8.      Defendant CBP Officer Ramos, at all times relevant herein, was an officer and/or agent with Customs and Border Protection.  He was on duty at the Otay Mesa Port of Entry on November 2, 2013.  At all times mentioned herein, this defendant was an employee of CBP and acting in an official capacity and under color of law.  This defendant participated in the decision to arrest Plaintiff on a warrant that he knew, should have known, and/or strongly suspected pertained to a different person.  This officer's first

name is presently unknown to plaintiff.

9.      Defendant CBP Officer Amir, at all times relevant herein, was an officer and/or agent with Customs and Border Protection.  He was on duty at the Otay Mesa Port of Entry on November 2, 2013. At all times mentioned herein, this defendant was an employee of CBP and acting in an official capacity and under color of law.  This defendant participated in the decision to arrest Plaintiff on a warrant that he knew, should have known, and/or strongly suspected pertained to a different person. This officer's first name is presently unknown to plaintiff.

10.      Defendant CBP Officer Gomez, at all times relevant herein, was an officer and/or agent with Customs and Border Protection.  He was on duty at the San Ysidro Port of Entry on November 2 and the morning of November 3, 2013. At all times mentioned herein, this defendant was an employee of CBP and acting in an official capacity and under color of law.  This defendant participated in the decision to arrest Plaintiff on a warrant that he knew, should have known, and/or strongly suspected pertained to a different person. This officer's first name is presently unknown to plaintiff.

11.      Doe CBP Officers 1-50 were, at all times relevant to this lawsuit, officers and/or agents with Customs and Border Protection.  The Doe CBP Officers include, but are not limited to, a female CBP officer who was on duty at the San Ysidro Port of Entry on or about November 2, 2013, and who subjected Plaintiff to two separate body-cavity examinations; other officers who participated in the decision to arrest Plaintiff; other officers who participated in or witnessed the body-cavity searches; and other supervisory officials within CBP.

12.      Defendant San Diego County Sheriff's Department ("SDCS") is a law enforcement agency for the county of San Diego, organized under the laws of the state of California.  Las Colinas Detention Facility is a local jail for female inmates within the county of San Diego, and is controlled and maintained by the San Diego County Sheriff's

COMPLAINT

Department.  Doe SDCS Deputies 1-50 were, at all times relevant to this lawsuit, sheriff's deputies working at the Las Colinas Detention Facility where Plaintiff was booked after being transported from the San Ysidro Port of Entry.  Doe SDCS Deputies booked Plaintiff into custody at Las Colinas despite the fact that they knew, should have known, and/or strongly suspected that she was not the person wanted on the warrant.

13.     Defendant Contra Costa County Sheriff's Department ("CCCSD") is a law enforcement agency for the county of Contra Costa, organized under the laws of the state of California. CCCSD Deputies A. Charles and M. Bailey, at all times relevant herein, were deputies with the Contra Costa County Sheriff's Department, and were acting in an official capacity and under color of law.  These deputies swore out a complaint and a warrant for Joanne Lewis that unlawfully, and with deliberate indifference to the constitutional rights of Plaintiff, included Plaintiff's Driver's License number.  CCCSD Deputy A. Charles, CCCSD Deputy M. Bailey, and Defendant CCCSD also failed to institute precautions and training to properly describe the person wanted on the warrant and exclude innocent persons from the risk of arrest, thereby demonstrating a deliberate indifference of the risk to the public that it posed.  Doe CCCSD Deputies 1-50 were, at all times relevant to this lawsuit, working as employees of Contra Costa county, performing in an official capacity and under color of state law.  These employees include but are not limited to the person who, when finally contacted by CBP and advised of the discrepancies between Plaintiff and the person wanted on the warrant, advised CBP to continue to hold her anyway, despite the fact that he or she knew, should have known, and/or strongly suspected that it was not the correct person.

## FACTUAL ALLEGATIONS

14.     The warrant that caused Plaintiff's arrest had been issued sixteen years earlier.  On June 27, 1997, defendant CCCSD deputies P. Omary and J. Rubin arrested a woman named Joanne Lewis ("Lewis") after responding to a call about an apparent

heroin overdose at a house in Richmond, California.

15.   According to the CCCSD police report, Lewis is African-American, stands 5'8" tall, and was born on April 20, 1962.   She weighed approximately 150 pounds.  She lived in Contra Costa County.

16.   Defendant CCCSD deputies P. Omary and J. Rubin arrested Lewis for possession of drugs and being under the influence of a controlled substance, but released her pursuant to California Penal Code Section 849.

17.   Several months later, on October 17, 1997, defendant CCCSD deputy A. Charles (on behalf of defendant CCCSD deputy M. Bailey) submitted a sworn declaration in support of a complaint charging Lewis with a violation of Health & Safety Code Section 11350 for possession of a controlled substance.

18.   Defendant CCCSD deputy Charles incorporated by reference the files from CCCSD Case No. 97-17638, and requested that a warrant be issued for Lewis's arrest.

19.   As part of the warrant request, Defendants CCCSD and CCCSD deputies A. Charles, M. Bailey, and Doe CCCSD Deputies 1-50, with deliberate indifference to the foreseeable risks to Plaintiff and others, alleged that Lewis was using Plaintiff's California Driver's License number.  They included this allegation in their warrant paperwork, and thereby tied Plaintiff's DMV number to the wanted Lewis in the warrant abstract.

20.   Defendant CCCSD, CCCSD deputies A. Charles and M. Bailey, and Doe CCCSD Deputies 1-50 did not include any other identifying information—such as Lewis's physical description—on the warrant or warrant abstract as required by California Penal Code Section 850.

21.   Defendant CCCSD, CCCSD deputies A. Charles and M. Bailey, and Doe CCCSD Deputies 1-50 knew or should have known that an innocent person could suffer

COMPLAINT

an unlawful arrest and a violation of their Fourth Amendment rights if they attached someone else's driver's license number to the warrant and warrant abstract issued against Lewis, and failed to describe Lewis in sufficient detail to avoid risk to innocent members of the public.

22.     Defendant CCCSD was deliberately indifferent to Plaintiff's and the public's Fourth Amendment rights by failing to provide its employees, officers, and deputies with adequate training on properly preparing, drafting, and requesting arrest warrants.

23.     Defendant CCCSD was deliberately indifferent to Plaintiff's Fourth Amendment rights by failing to have in place practices or procedures for including and reviewing information attached to an arrest warrant and warrant abstract.  CCCSD and its agents knew, or should have known, that given enough time, an innocent person could be arrested on this warrant.

24.     On November 2, 2013, an innocent person was arrested on this warrant. On that date, Plaintiff traveled to Tijuana, Mexico with her church group to volunteer at an orphanage.

25.     She spent the day with fellow members of her congregation playing with the children, providing food and other goods, and generally trying to be of service to the orphanage.

26.     The church group, including Plaintiff, returned to the Otay Mesa Port of Entry (at the United States / Mexico border) at approximately 4:00 p.m. the same day.

27.     They were on foot, having left their vehicles on the American side of the border.

28.     The group was accompanied by several clergy members of Plaintiff's church.

29.     At the Port of Entry, Plaintiff handed her passport to the Customs and

COMPLAINT

Border Protection officer who was assigned to the pedestrian lane she was standing in.

30.     The passport had a color photograph of Plaintiff and it correctly listed her date of birth as xx-xx-1963.

31.     In response to questions by the CBP officer, Plaintiff explained that she had been in Mexico working at an orphanage with her church group.

32.     This information was consistent with the account of the other members of Plaintiff's congregation who entered before and after her in line, as well as the account of the pastors who passed through the Port of Entry with the group.

33.     Plaintiff also provided her correct social security number to the CBP officer, ending in 1218.

34.     The CBP officer wrote down this information on a piece of paper.

35.     This first officer gave the paper to CBP Officer Amir, who was on duty at the Otay Mesa Port of Entry that day.

36.     Officer Amir was stationed behind a computer approximately 10 feet away from where Plaintiff first gave her passport to CBP in line.

37.     Officer Amir typed some information into the computer.  On information and belief, Officer Amir was entering information into the computer from Plaintiff's passport and from the piece of paper provided by the first officer.

38.     Officer Amir then asked Plaintiff some additional questions.

39.     In response to Amir's questions, Plaintiff provided, again, her correct social security number, ending in 1218.

40.     In response to Amir's questions, Plaintiff also stated that she was 5'2". She specifically denied that she was 5'8", and reiterated that she was 5'2".

41.     In response to Amir's questions, Plaintiff stated that she was born on xx-xx-1963.  She specifically denied that she was born on the same day in 1962.

42.     Officer Amir then told Plaintiff that she was being detained.

COMPLAINT

43.     Amir placed Plaintiff in handcuffs.  This occurred within view of members of her church congregation.

44.     Amir did not tell Plaintiff why she was being detained at that time.  He simply took her to a back room within the Port of Entry instead.

45.     After Plaintiff was in the back room for some time,  CBP officer Ramos entered the room and spoke to Plaintiff.

46.     Officer Ramos took Plaintiff's personal belongings from her.

47.     Officer Ramos ordered Plaintiff to take down her hair so that it could be inspected.

48.     Officer Ramos immediately fingerprinted Plaintiff.

49.     A female officer performed a search of Plaintiff at the Otay Mesa Port of Entry.  This search consisted of the female officer running a gloved hand around Plaintiff's bra area and along the top of her underwear line.

50.     The search revealed no contraband or weapons.

51.     Approximately an hour later, Officer Ramos returned to the back room, where Plaintiff was still being held.

52.     He handed Plaintiff her property back and stated "this isn't you" or words to that effect.  Officer Ramos told Plaintiff that she was going to be released.

53.     By that time, Officer Ramos did not believe that Plaintiff was the person wanted on an outstanding warrant.

54.     The person actually wanted on the warrant: 1) had a date of birth of xx-xx-1962 (not 1963); 2) was African-American (not Caucasian); was 5'8" (not 5'2"); and was 150 lbs. (not 120).  That person also had an address in Contra Costa County, where Plaintiff had never even visited.

55.     Officer Ramos took Plaintiff back to where Officer Amir was still standing, behind the computer.  Officer Ramos informed Officer Amir that Plaintiff was

COMPLAINT

not the person wanted on a warrant.

56.     Officer Amir heard and understood Officer Ramos to be saying that Ramos did not believe that Plaintiff was the person wanted on the warrant.

57.     Officer Ramos told Officer Amir to clear Plaintiff and let her go because she was not the person wanted on the warrant.

58.     Officer Amir verbally confronted Officer Ramos, and inquired if he had checked other databases.  Officer Amir refused to release Plaintiff.

59.     The prevailing standard of care for law-enforcement officers required that someone contact the jurisdiction that issued the warrant, defendants Contra Costa County and CCCSD, to compare Plaintiff's physical description with the warrant and warrant abstract issued against Lewis.

60.     Reasonably trained officers would know that probable cause cannot be established by relying only on electronic wanted-persons systems.

61.     Reasonably trained officers would have confirmed with the issuing jurisdiction, defendants Contra Costa County and CCCSD, whether Plaintiff and Lewis were the same person.

62.     On information and belief, defendants CBP, Officer Amir, Officer Ramos, and Does 1-50 detained Plaintiff at the Otay Mesa Port of Entry by relying only on the electronic wanted-persons systems.

63.     Officer Ramos took Plaintiff to the back room once more, and took her property from her again.

64.     During this time at Otay Mesa, Plaintiff's pastor and a number of the members of her church group waited for her to be released.  A CBP officer eventually told them that Plaintiff was not going to be released.  He did not tell the church members why she was being arrested, leaving them to speculate on what she had done wrong.

65.     Plaintiff was humiliated and suffered fear and other emotional distress

COMPLAINT

during her detention.

66.     Plaintiff later suffered humiliation and embarrassment and damage to her reputation due to the fact that her arrest was known to her church congregation and clergy.

67.     Several hours later, at approximately 7:45 p.m., CBP transported Plaintiff from the Otay Mesa Port of Entry to the San Ysidro Port of Entry.

68.     CBP handcuffed Plaintiff with her hands behind her back, and loaded her into a van for transport to San Ysidro.

69.     There were other detainees in this van at the time, including men.

70.     Being handcuffed behind her back was physically painful to Plaintiff.

71.     Plaintiff suffered terror and emotional distress by being detained with male and female detainees in the back of a van, while handcuffed.

72.     After her arrival at the San Ysidro Port of Entry, Plaintiff was fingerprinted a second time.

73.     CBP officers took Plaintiff into a separate room at the San Ysidro Port of Entry.

74.     Three other female detainees were also in this room.

75.     A CBP officer ordered Plaintiff and the three other female detainees to turn and face one of the walls in the room.  The officer ordered the women to put their hands on a counter and spread their feet apart.

76.     Plaintiff did as she was instructed, not because she consented, but because it was an order under color of law.

77.     Plaintiff observed a female CBP officer working her way down the line of women, inspecting and searching each of them.

78.     Plaintiff could observe the female CBP officer placing a gloved hand down each of the first three women's pants as part of this search.

COMPLAINT

79.     Plaintiff was last in line.  When it was her turn to be searched, the female CBP officer did not merely run a hand over  Plaintiff's bra line, as the first officer had done at Otay Mesa.  Rather, this officer squeezed Plaintiff's breasts hard, causing physical pain and emotional distress.

80.     The female CBP officer then placed her hand down Plaintiff's pants and underwear.  The officer inserted her gloved finger inside Plaintiff's vagina.

81.     During this vaginal search, the CBP officer was still wearing the same glove that she had used to search the previous three detainees.

82.     CBP purports to have specific rules and procedures governing the circumstances under which a body cavity search may be performed, including but not limited to those set forth in the Customs and Border Protection "Personal Search Handbook."

83.     CBP rules and regulations require there to be a specific and articulable suspicion that contraband is concealed in a body cavity in order to justify a search.

84.     CBP rules and regulations require approval from a Port Director before proceeding with a body cavity search.

85.     CBP rules and regulations require that a body cavity search be performed in a medical setting, by trained medical personnel.  CBP officers are not allowed to perform body-cavity searches themselves, per their own rules and regulations.

86.     CBP rules require that if a body-cavity search is to be performed, it must not occur in the presence of officers of the other gender, and it must be done in reasonable privacy.

87.     The female officer who searched Plaintiff did not have a specific and articulable suspicion that Plaintiff was concealing contraband or weapons in her vagina.

88.     On information and belief, the female officer who searched Plaintiff was not a trained physician, nurse, or medical assistant.

89.     The body cavity search was performed in the presence of three other female detainees, and at least one male CBP officer.

90.     The body cavity search was performed in a room at the Port of Entry, not in a medical setting.

91.     On information and belief, the officer who searched Plaintiff did not obtain permission from a supervisor to conduct a body cavity search prior to doing so.

92.     This body cavity search caused Plaintiff physical pain, emotional distress, and subjected her to the risk of sexually transmitted disease and infection.

93.     Plaintiff was visibly upset, crying and professing her innocence during and after this invasive search.

94.     CBP officers mocked Plaintiff for her emotional distress before and after the search.  They called her a "basket case" and made other similar derogatory comments about her.

95.     Less than 20 minutes after the first body cavity search, the same female officer made Plaintiff stand up for another search.

96.     Plaintiff complained that she had just been searched, and inquired why the officer was searching her again.

97.     The female officer responded, "Because I am!"

98.     As part of this second search, the female officer inserted her finger into Plaintiff's vagina for a second time.

99.     The female officer instructed Plaintiff to look straight ahead during this second body-cavity search; she threatened Plaintiff that she "better not move" during the search.  Plaintiff began to cry uncontrollably after this second invasive search.

100.    Officers mocked her more, making additional derogatory comments and insults.

101.    Plaintiff asked the female officer who had conducted the searches if she

COMPLAINT

could  use the restroom.  The female officer refused, telling Plaintiff to "hold it."  At approximately 10:00 p.m. the same night, CBP Officer Gomez entered the room.

102.     Officer Gomez fingerprinted Plaintiff for a third time.  Plaintiff explained to Officer Gomez that she had no criminal history whatsoever, and had never failed to appear on a criminal matter—in Contra Costa County or anywhere else.

103.     Officer Gomez reviewed what appeared to be paperwork associated with Plaintiff and her detention and stated, "this is all wrong" or words to that effect.

104.     Officer Gomez left the room, saying he was going to investigate further.

105.     Officer Gomez returned and asked Plaintiff her maiden name.  She replied, truthfully,  "Constestabile."

106.     Plaintiff protested to Officer Gomez that she was not the person wanted on a warrant.

107.     Plaintiff told Officer Gomez her correct date of birth, her height, and her maiden name.  Officer Gomez also had access to Plaintiff's passport, fingerprints, and social security number.  CBP Officers actually spoke to members of Plaintiff's family on the phone that night.  They did not use that opportunity to determine that Plaintiff was not the person wanted on the warrant.

108.     Officer Gomez represented to Plaintiff that he had been on the phone with authorities from Contra Costa County, where the warrant originated.  On information and belief, no one from CBP contacted Contra Costa County prior to Officer Gomez's phone call, and that call did not occur until after 10:00 p.m. that night.

109.     Officer Gomez informed the officer or deputy from Contra Costa County about the discrepancies between Plaintiff's identifying information and the person wanted on the warrant, including the different date of birth, the half-foot discrepancy in height, and the difference in race.

110.     Defendant CCCSD instructed Officer Gomez to continue to detain

COMPLAINT

Plaintiff and to send her up to Contra Costa County on the warrant.

111.    Defendant CCCSD did so despite the fact that he or she knew, or should have known, that Plaintiff was not the person wanted on the warrant.

112.    Defendants CCCSD and Doe CCCSD Deputies 1-50 knew or should have known that Plaintiff and/or other innocent persons would suffer an unlawful arrest and a violation of her Fourth Amendment rights if her identity was not confirmed.

113.    If Defendant CCCSD had an adequate policy and procedure for ascertaining the identity of persons wanted on a warrant, and whether a person in custody was that person, they would have been able to determine that Plaintiff was not the person wanted on the warrant.  With adequate policies and procedures in place, CCCSD could and would have determined that a 5'2", 120-pound Caucasian woman with a different birth year was not the person wanted on the warrant.

114.    Defendant CCCSD did not have adequate policies or procedures in place. Rather, CCCSD's custom and practice was to issue warrants without sufficient details, and then detain a person by default when in doubt about the identity of a person arrested on a warrant.

115.    CBP Officer Gomez explained to Plaintiff that he did not believe that she was the person wanted on the warrant, but that there was nothing he could do.  He refused to release her.

116.    Beginning at approximately 1:40 the next morning, CBP officers transported Plaintiff to the Las Colinas Detention Facility, a jail for women run by the San Diego County Sheriff's Department.

117.    CBP officers again placed Plaintiff in handcuffs, handcuffing her hands behind her back.  She remained handcuffed in this fashion until she arrived at Las Colinas.

118.    CBP officers placed her in the back of a van.  The van contained other

17

male detainees who were being transported from the Port of Entry.  Plaintiff had also been left in a holding cell alone and unattended with male detainees prior to being transported by van.

119.    Plaintiff was in excruciating pain from having her hands handcuffed behind her back during this transport.

120.    Plaintiff was terrified at being caged at the Port of Entry, and later in the back of a van, handcuffed, in the presence of male detainees.

121.    Eventually Plaintiff was deposited at the Las Colinas Detention Facility. She was subjected to a DNA swab at Las Colinas, which she did not consent to.

122.    Plaintiff informed at least six different SDCS deputies and/or employees at Las Colinas, at various times, that she was not the person wanted on the warrant.

123.    Plaintiff informed at least six different SDCS deputies and/or employees at Las Colinas, at various times, that her date of birth was wrong, and gave them her correct identifying information.

124.    One SDCS deputy at Las Colinas responded to Plaintiff's claims of innocence by stating, "I don't care."  The others ignored her and/or stated it was not their problem.

125.    SDCS deputies knew that Plaintiff was born in 1963, that she was 5'2", and that she was Caucasian.

126.    SDCS deputies knew or should have known that Plaintiff was not the person wanted on the warrant.  But they accepted her into custody and detained her anyway.

127.    Plaintiff continued to attempt to tell SDCS deputies at Las Colinas that she had the wrong person, but her claims were ignored.

128.    Defendant San Diego County Sheriff's Department has written policies and procedures that govern the acceptance of arrestees on out-of-county warrants.  But

these written protocols require only matching the name on the warrant abstract to the name of the person arrested.

129.     These policies and procedures do not require verifying any other identifying information between the person sought on the warrant and the person arrested.

130.     These policies and procedures fail to adequately guard against the foreseeable risk that a person could be arrested on a warrant intended for someone else. Despite the obvious and foreseeable risk that wrongful arrest poses to innocent members of the public, Defendant SDCS did not have an adequate procedure for addressing claims of mistaken identity on a warrant.

131.     Instead, Defendant SDCS relies on a policy of detention by default when in doubt about the identity of a person arrested on a warrant.

132.     Specifically, Defendant SDCS's current policies and procedures relating to claims of mistaken identity state that "if a watch commander is unable to determine if the inmate is the subject of the warrant, the inmate will remain in custody."  On information and belief, this policy was at least the prevailing custom and practice, if not the written policy, in place at the time of Plaintiff's arrest.

134.     Plaintiff remained in custody at Los Colinas as a result of the unconstitutional policies, practices, and customs of Defendant SDCS, and because of the deliberate indifference of Doe SDCS Deputies at Las Colinas.

135.     Plaintiff, with the help of a sympathetic inmate, was finally able to contact a bailbondsman.  She eventually posted a $10,000 bond (which cost a $1,000 premium plus miscellaneous costs and fees).

136.     Upon her release from Las Colinas, Plaintiff was given some of property back, but not all of it.

137.     In particular, she was given back one diamond hoop earring that was a gift from her son.  The other earring was missing.  The earrings held significant

sentimental value to Plaintiff.

138.    Plaintiff told the property deputy that she was wearing two earrings, and that one of them was missing.

139.    The deputy responded, "That's your problem."

140.    The other earring has never been returned.

141.    After making bail, Plaintiff hired an attorney to address the warrant and criminal case in Contra Costa county.

142.    The Contra Costa County District Attorney's Office almost immediately dismissed the case against Plaintiff.

143.    On November 12, 2013 the Superior Court for the County of Contra Costa granted the District Attorney's motion for a finding of Factual Innocence as to Plaintiff.

144.    On November 18, 2013, Plaintiff contacted the Customs and Border Protection Customer Information center, and spoke to Branch Chief Norman Bright.  She reported her treatment at the Ports of Entry stated that she wanted to find out who was responsible and what went wrong.

145.    CBP generated a reference number for her complaint and report: 131118-002347.

146.    On November 18, 2013, Chief Norman Bright sent Plaintiff an email, thanking her for contacting the U.S. Customs and Border Protection INFO Center.  Chief Bright instructed Plaintiff to "contact the Joint Intake Center at 877-246-8253.  Please send me an email with the details of what happened with your arrest."

147.    Plaintiff called the number as instructed.  She also sent a detailed email to CBP Chief Bright.  The email described what had happened to Plaintiff on the day of her arrest.

148.    This email was sent to Chief Norman Bright at the email address:

"customs@customs-mail.custhelp.com".

149.     On information and belief, Chief Bright received Plaintiff's November 18, 2013 email.

150.     This email to Chief Bright included a description of the discrepancy between the wanted person and herself—namely that she was 5'2" not 5'8"; that she was Caucasian not African-American; and that her birth year was 1963 not 1962.   In summary, it described in detail the facts of her arrest on a warrant for someone else.

151.     Plaintiff's November 18, 2013 email to Chief Bright also told him explicitly that she was subjected to multiple illegal vaginal searches at the Port of Entry. The email included the following paragraph:

> "At aprox 7:45 pm they cuffed me again and moved me to San Ysidro. When I arrived I was patted down again.  This time very aggressively! This officer squeezed my breasts very hard and went into my underwear and in my vagina with her finger. She did this with the same glove that she did three other women before me!! I was mortified!!!! I never felt so violated!!! I was told to sit in a chair. I kept asking why I was there and I just kept being told to be quiet. After about 20 minutes the same female officer called my name again and repeated the pat down! When I questioned why she was doing it again she told me" because I am" and the male officer behind her said "What do you work here?" Even if I was a criminal NO ONE should be treated in this manner!!!

152.     CBP never responded to Plaintiff's email.

153.     On information and belief, neither Chief Norman Bright nor any other CBP employee took any follow-up action in response to Plaintiff's email and telephonic complaints.

154.     As late as 2014, Plaintiff's federal "rap sheet" continued to reflect an arrest for narcotics charges.  On information and belief, her rap sheet continues to be associated with that arrest and charge.

155.     In approximately June of 2014, Plaintiff underwent a background check as part of a new job opportunity.  The background check, which utilized F.B.I. and Department of Justice databases, revealed a November 2, 2013 arrest at San Ysidro.  It included a  description of the charge as "COUNTS OF POSSESS NARCOTIC CNTL

SUB."  The records show that this arrest is tied to Plaintiff's "TEN-PRINT SUBMISSION," i.e., her fingerprints.

156.    Plaintiff now suffers from distress, fear, and humiliation from the fact that *her* personal information—including date of birth, fingerprints, social security number, and even DNA—is now tied to this warrant and arrest at the Port of Entry.  She also believes that other background checks for other job opportunities revealed this wrongful criminal record, costing her job opportunities and loss of income.

157.    Plaintiff lives in fear that she will wrongfully be associated with the felon from Contra Costa County in the future.

158.    Since the arrest, Plaintiff has been unable to travel outside of the United States, for fear of being wrongfully arrested at the border and subjected to the same treatment that she suffered in 2013.

159.    Plaintiff's church group continues to travel to Mexico regularly to volunteer at the orphanage, but she is unable to participate even though she would like to.

160.    Plaintiff has also been unable to travel with friends or family as a result of this incident.

161.    Plaintiff suffers continuing harm from her wrongful arrest and sexual assault, including but not limited to fear of law enforcement, anxiety, emotional distress, restrictions on her daily movements and life, and nightmares.

# I.

## FIRST CAUSE OF ACTION

### *Bivens* action: Unlawful Arrest

162.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs.

163.     This cause of action is based upon *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971).

164.     Plaintiff had a Fourth Amendment right to freedom of movement and freedom from unreasonable seizures which Defendants Amir, Ramos, Gomez, and CBP Doe Officers violated by detaining and arresting her on a warrant that they actually knew or should have known pertained to someone else.  These defendants were not acting in good faith, were acting under color of law, and violated Plaintiff's Fourth Amendment rights.

165.     Defendants CBP Officers Amir, Ramos, Gomez, and CBP Doe Officers' actions in illegally detaining and arresting Plaintiff caused damage to her, and led to the later harms that occurred.  These defendants are being sued in their individual capacities for the purposes of this cause of action.

# II.

## SECOND CAUSE OF ACTION

### FTCA: False Imprisonment

166.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs.

167.     Defendants Amir, Ramos, Gomez, and CBP Doe Officers intentionally deprived Plaintiff's freedom of movement by force, threats of force, menace, and duress.

168.     Defendants Amir, Ramos, Gomez, and CBP Doe Officers arrested Plaintiff, or contributed to her arrest, in their official capacity and in the scope of their

COMPLAINT

employment as Customs and Border Protections Officers of the United States.

169.    Plaintiff was not allowed to leave for an appreciable time.

170.    Plaintiff did not consent to be imprisoned.

171.    Plaintiff was actually harmed by the conduct of the Defendants and Defendants' conduct was a substantial factor in causing harm to Plaintiff.

### III.

### THIRD CAUSE OF ACTION

### FTCA: Negligence

172.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs.

173.    Defendants Amir, Ramos, Gomez, and CBP Doe Officers had a duty to avoid violating Plaintiff's rights to freedom of movement and bodily integrity, and to use reasonable care in the execution of an arrest warrant to ensure that it was for the correct person.

174.    Defendants Amir, Ramos, Gomez, and CBP Doe Officers breached their duty of care and caused harm to Plaintiff, including physical pain, terror, mental anguish, humiliation, damage to reputation, and financial loss.

175.    Defendants Amir, Ramos, Gomez, and CBP Doe Officers acted in their official capacity and in the scope of their employment as Customs and Border Protections Officers of the United States.

176.    As a direct, proximate, and foreseeable result of the Defendants' breach of their duty of care, Plaintiff suffered damages in an amount according to proof at the time of trial.

COMPLAINT

## IV.

## FOURTH CAUSE OF ACTION

### Administrative Procedures Act Claim, 5 U.S.C. § 701 *et seq.*

177.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs.

178.    Defendant United States has adopted customs, policies, rules, and/or procedures for the execution of arrest warrants that are arbitrary, capricious, an abuse of discretion, not in accordance with the law, and without observance of the procedures required by law.

179.    Plaintiff suffered and continues to suffer legal wrong, and was and continues to be adversely aggrieved, by the customs, policies, rules, and/or procedures regarding the execution of warrants adopted by the United States.  Specifically, Plaintiff cannot travel without the justified fear that she will be wrongly identified again, that she will be wrongly associated with another person's warrant or criminal record, and that her prior mistreatment will be repeated.

180.    These policies, rules, and procedures resulted and continue to result in violations of Plaintiff's statutory and constitutional rights, as alleged in the prior paragraphs of this complaint, and are considered a final agency action for which there is no other adequate remedy in court.

## V.

## FIFTH CAUSE OF ACTION

### Administrative Procedures Act Claim, 5 U.S.C. § 701 *et seq.*

181.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs.

182.    Defendant United States has adopted customs, policies, rules, and/or procedures for entering and purging information (and refusing to purge information) from

COMPLAINT

a person's criminal history record, and these practices are arbitrary, capricious, an abuse of discretion, not in accordance with the law, and without observance of the procedures required by law.

183.     Plaintiff suffered and continues to suffer legal wrong, and was and continues to be adversely aggrieved, by the policies, rules, and procedures for entering and purging information from a person's criminal history record adopted by the United States.  Specifically, Plaintiff continues to have a "rap sheet" and criminal history records reflecting a narcotics arrest at the Port of Entry, associating her identifying information and fingerprints with this arrest, and incorrectly tying her to a different person's warrant and crimes.

184.     These policies, rules, and procedures resulted and continue to result in violations of Plaintiff's statutory and constitutional rights, as alleged in the prior paragraphs of this complaint, and are considered a final agency action for which there is no other adequate remedy in court.

## VI.

## SIXTH CAUSE OF ACTION

### *Bivens* action: Illegal Search

185.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs.

186.     This cause of action is based upon *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971).

187.     Plaintiff had a Fourth Amendment right to be free of unreasonable searches, which Defendants CBP Doe Officers violated by subjecting her to an invasive and unjustified body cavity search.  These defendants were not acting in good faith, were acting under color of law, and violated Plaintiff's Fourth Amendment rights.

188.     Defendant CBP Doe Officers' actions in illegally searching Plaintiff

26

caused damage to her, in an amount to be proven at trial.  These defendants are being sued in their individual capacities for the purposes of this cause of action.

## VII.

## SEVENTH CAUSE OF ACTION

### FTCA: Battery

189.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs.

190.     Defendant CBP Doe Officers acted with an intent to cause harmful or offensive contact with the person of Plaintiff and the intended harmful or offensive contact did in fact occur.

191.     Defendant CBP Doe Officers subjected Plaintiff to an invasive and unlawful body cavity examination, including placing a gloved finger inside her vagina.

192.     CBP Doe Officers acted in their official capacity and in the scope of their employment as Customs and Border Protections Officers of the United States.

193.     The harmful or offensive contact was not privileged nor consented to and was excessive, unreasonable, and done with deliberate indifference to the rights and safety of Plaintiff.

194.     As a result of CBP Doe Officers' intent to cause harmful or offensive contact with the person of Plaintiff, and the fact that the intended harmful or offensive contact did in fact occur, Plaintiff suffered damages according to proof at the time of trial. Said damages are currently in excess of the jurisdictional minimum of this court and include general and special damages according to proof at the time of trial.

COMPLAINT

## VIII.

## EIGHTH CAUSE OF ACTION

### *Bivens* action: Second Illegal Search

195.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs.

196.     This cause of action is based upon *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971).

197.     Plaintiff had a Fourth Amendment right to be free of unreasonable searches, which defendants CBP Doe Officers violated by subjecting her to a *second* invasive and unjustified body cavity search.  These defendants were not acting in good faith, were acting under color of law, and violated Plaintiff's Fourth Amendment rights.

198.     Defendant CBP Doe Officers' actions in illegally searching Plaintiff for a second time caused damage to her, in an amount to be proven at trial.  These defendants are being sued in their individual capacities for the purposes of this cause of action.

## IX.

## NINTH CAUSE OF ACTION

### FTCA: Battery

199.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs.

200.     Defendant CBP Doe Officers acted with an intent to cause harmful or offensive contact with the person of Plaintiff and the intended harmful or offensive contact did in fact occur.

201.     Defendant CBP Doe Officers subjected Plaintiff to a second invasive and unlawful body-cavity examination, including placing a gloved finger inside her vagina.

202.     CBP Doe Officers acted in their official capacity and in the scope of their employment as Customs and Border Protections Officers of the United States.

203.     The harmful or offensive contact was not privileged nor consented to and was excessive, unreasonable, and done with deliberate indifference to the rights and safety of Plaintiff.

204.     As a result of CBP Doe Officers' intent to cause harmful or offensive contact with the person of Plaintiff, and the fact that the intended harmful or offensive contact did in fact occur, Plaintiff suffered damages according to proof at the time of trial. Said damages are currently in excess of the jurisdictional minimum of this court and include general and special damages according to proof at the time of trial.

## X.

## TENTH CAUSE OF ACTION

## (FTCA: Cal. Civ. Code §52.1)

205.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs.

206.     Defendants Amir, Ramos, Gomez and CBP Doe Officers violated Plaintiff's clearly established rights under the California Constitutions and statutes, which include, but are not limited to, the following:

(a) Article I, Section 13 of the California Constitution: right to be free from unreasonable detentions, searches, and seizures; and

(b) California Civil Code Section 43: right of protection from bodily restraint or harm, from personal insult and from defamation.

207.     The California Legislature has declared that it is a violation of state civil rights act for any person to interfere with the exercise or enjoyment by any individual of her rights secured by the United States Constitution or state or federal law. This includes any interference of these rights by threats, intimidation, coercion or attempted threats, intimidation or coercion.

208.     These Defendants interfered with Plaintiff's rights under the California

Constitution and statutes by the detention and seizure alleged above.

209.    The conduct alleged herein caused Plaintiff to be deprived of her civil rights that are protected under the California Constitution and statutes which has also legally, proximately, foreseeably and actually caused her to suffer emotional distress, pain and suffering, damage to reputation and further damages according to proof at the time of trial.

## XI.

## ELEVENTH CAUSE OF ACTION

## (FTCA: Cal. Civ. Code §52.1)

210.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs.

211.    Defendants CBP Doe Officers violated Plaintiff's clearly established rights under the California Constitutions and statutes, which include, but are not limited to, the following:

(a) Article I, Section 13 of the California Constitution - right to be free from unreasonable detentions, searches, and seizures; and

(b) California Civil Code Section 43 - right of protection from bodily restraint or harm, from personal insult and from defamation.

212.    The California Legislature has declared that it is a violation of state civil rights act for any person to interfere with the exercise or enjoyment by any individual of her rights secured by the United States Constitution or state or federal law. This includes any interference of these rights by threats, intimidation, coercion or attempted threats, intimidation or coercion.

213.    These Defendants interfered with Plaintiff's rights under the California Constitution and statutes by the illegal and invasive body-cavity searches alleged above.

214.    The conduct alleged herein caused Plaintiff to be deprived of her civil

COMPLAINT

rights that are protected under the California Constitution and statutes which has also legally, proximately, foreseeably and actually caused her to suffer emotional distress, pain and suffering, damage to reputation and further damages according to proof at the time of trial.

## XII.

## TWELFTH CAUSE OF ACTION

### Violation of constitutional rights under color of law (42 U.S.C. § 1983)

215.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs.

216.     Defendants Doe SDCS Deputies, during all times relevant herein were acting under color of state law.  These defendants are being sued in their individual capacities for the purposes of this cause of action.

217.     Plaintiff had a Fourth Amendment right to freedom of movement, and to be free from illegal and unreasonable arrests.

218.     Plaintiff had a Fourth Amendment right to freedom of movement which Defendants Doe SDCS Deputies violated by detaining and arresting her on a warrant that they actually knew or should have known pertained to someone else.  These defendants were not acting in good faith, were acting under color of law, and violated Plaintiff's Fourth Amendment rights.

219.     Defendants Doe SDCS Deputies' actions in illegally detaining and arresting Plaintiff caused damage to her, in an amount to be proven at trial.

COMPLAINT

# XIII.

## THIRTEENTH CAUSE OF ACTION

### Violation of constitutional rights under color of law (42 U.S.C. § 1983)

220.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs.

221.    Defendants CCCSD Deputies A. Charles and M. Bailey, and Doe CCCSD Deputies, during all times relevant herein were acting under color of state law.  These defendants are being sued in their individual capacities for the purposes of this cause of action.

222.    Plaintiff had a Fourth Amendment right to freedom of movement, and to be free from illegal and unreasonable arrests.

223.    Plaintiff had a Fourth Amendment right to freedom of movement which Defendant CCCSD Deputies A. Charles and M. Bailey, and Doe CCCSD Deputies violated by issuing, with deliberate indifference, a warrant that carried a foreseeable and obvious risk to Plaintiff and the public of wrongful arrest.  Doe CCCSD Deputies also violated Plaintiff's Fourth Amendment rights by instructing U.S. Customs and Border Protection Officers to continue to detain her on a warrant that they actually knew or should have known pertained to someone else.  These defendants were not acting in good faith, were acting under color of law, and violated Plaintiff's Fourth Amendment rights.

224.    Defendants Doe CCCSD Deputies' actions in illegally detaining and arresting Plaintiff caused damage to her, in an amount to be proven at trial.

# XIV.

## FOURTEENTH CAUSE OF ACTION

### Unconstitutional customs, policies or practices (*Monell*, 42 U.S.C. § 1983)

225.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs.

226.     Defendant SDCS maintained unconstitutional customs, policies, or practices, within the meaning of *Monell v. Department of Social Services*, 436 U.S. 658 (1978) ("Monell"), for executing warrants and verifying the identity of persons held on such warrants.  These customs, policies, or practices resulted in a violation of Plaintiff's Fourth Amendment rights.

227.     Defendants' unconstitutional customs, policies, and practices included but were not limited to: failing to consider a person's physical description or other distinguishing personal information before booking that person into custody on a warrant; failing to establish proper procedures to address claims of mistaken identity; ignoring facts and circumstances that conflicted with information in the warrant and thus undermined probable cause; and relying on an explicit policy of detention by default when it was uncertain if a person was the one wanted on a warrant.

228.     Defendants' unconstitutional customs, policies, and practices amounted to deliberate indifference of Plaintiff's Fourth Amendment rights.  These customs, policies, and practices were the moving force behind the violation of Plaintiff's Fourth Amendment rights, and proximately, foreseeably and actually caused Plaintiff to suffer damages in an amount to be proven at trial.

## XV.

## FIFTEENTH CAUSE OF ACTION

### Failure to train and/or supervise (*Monell*, 42 U.S.C. § 1983)

229.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs.

230.     Defendant SDCS, as a matter of custom, practice or policy, failed to institute, require, and enforce proper and adequate training and supervision for verifying the identity of a person arrested on a warrant, when the need for such training and supervision was obvious and the resulting harm was foreseeable.  Defendant SDCS's

failure to properly train and supervise its employees resulted in a violation of Plaintiff's Fourth Amendment rights.

231.    Defendant SDCS failed to train its employees to consider a person's physical description or other distinguishing personal information before booking that person into custody on an arrest warrant.

232.    Defendant SDCS failed to train its employees on how to properly address claims of mistaken identity from a person arrested on a warrant.

234.    Defendant SDCS failed to train its employees adequately by instructing them to rely on a policy of detention by default when in doubt about the identity of a person arrested on a warrant.

235.    Defendant SDCS failed to supervise its employees on the manner in which they verified the identity of a person arrested on a warrant and the manner in which they resolved claims of mistaken identity on a warrant.

236.    Defendant SDCS's failure to properly train and supervise its officers and employees, as a matter of policy, custom and practice, was deliberately indifferent to Plaintiff's Fourth Amendment rights and done with conscious disregard for the dangers of harm and injury to Plaintiff and others similarly situated.  This failure to train and supervise was the moving force behind the violation of Plaintiff's Fourth Amendment rights, and proximately, forseeably and actually caused Plaintiff to suffer damages in an amount to be proven at trial.

## XVI.

## SIXTEENTH CAUSE OF ACTION

### Unconstitutional customs, policies or practices (*Monell,* 42 U.S.C. § 1983)

237.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs.

238.    Defendant CCCSD maintained unconstitutional customs, policies, or

COMPLAINT

practices, within the meaning of *Monell*, for issuing warrants and verifying the identity of a person arrested on a warrant.  These customs, policies, or practices resulted in a violation of Plaintiff's Fourth Amendment rights.

239.    Defendant CCCSD's unconstitutional customs, policies, and practices included but were not limited to: issuing warrants with insufficient personal identifying information, such as physical description, to avoid foreseeable risk to innocent persons; failing to institute safeguards to avoid inclusion of erroneous information, such as Plaintiff's driver's license number, in an arrest warrant; failing to consider personal identifying information, such as physical description, before requesting the booking of a person into custody on an arrest warrant; maintaining inadequate policies, practices, or procedures for preparing, requesting, and issuing arrest warrants; maintaining inadequate policies, practices, or procedures for addressing claims of mistaken identity; and adopting a policy of detention by default when in doubt about a person's identity.

240.    Defendant CCCSD's unconstitutional customs, policies, and practices amounted to deliberate indifference of Plaintiff's Fourth Amendment rights.  These customs, policies, and practices were the moving force behind the violation of Plaintiff's Fourth Amendment rights, and proximately, forseeably and actually caused Plaintiff to suffer damages in an amount to be proven at trial.

## XVII.

## SEVENTEENTH CAUSE OF ACTION

### Failure to train and/or supervise (*Monell*, 42 U.S.C. § 1983)

241.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs.

242.    Defendant CCCSD, as a matter of custom, practice or policy, failed to institute, require, and enforce proper and adequate training and supervision for verifying the identity of a person arrested on a warrant, when the need for such training and

COMPLAINT

supervision was obvious.  Defendants' failure to properly train and supervise its employees resulted in a violation of Plaintiff's Fourth Amendment rights.

243.    Defendant CCCSD failed to train their employees on proper procedures for preparing, requesting, and issuing arrest warrants, including attaching to the warrant and warrant abstract any distinguishing personal information for the person sought on the warrant.

244.    Defendant CCCSD failed to train their employees to consider a person's physical description or other distinguishing personal information before requesting that a person be booked into custody on an arrest warrant.

245.    Defendant CCCSD failed to train their employees on a proper policy to address claims of mistaken identity from a person arrested on a warrant.

246.    Defendant CCCSD failed to train their employees by instructing them to rely on a policy of detention by default when in doubt about the identity of a person arrested on a warrant.

247.    Defendant CCCSD failed to supervise their employees on the manner in which they prepared, requested, and issued arrest warrants, verified the identity of a person arrested on a warrant, and resolved claims of mistaken identity on a warrant.

248.    Defendant CCCSD's failure to properly train and supervise its officers, as a matter of policy, custom, and practice, was deliberately indifferent to Plaintiff's Fourth Amendment rights and done with conscious disregard for the dangers of harm and injury to Plaintiff and others similarly situated.  Defendant's failure to train and supervise its employees was the moving force behind the violation of Plaintiff's Fourth Amendment rights, and proximately, forseeably and actually caused Plaintiff to suffer damages in an amount to be proven at trial

COMPLAINT

**PRAYER FOR RELIEF**

Plaintiff prays for judgment against defendants as follows:

1.     General and compensatory damages in an amount according to proof;

2.     Punitive and exemplary damages;

3.     Civil penalties as provided by law;

4.     Declaratory and injunctive relief remedying the continued policies, customs and practices governing how CBP, SDCS, and CCCSD acts upon warrants and ascertains the identities of the wanted persons to avoid future harm;

5.     Declaratory and injunctive relief expunging any criminal record, rap sheet, or similar document reflecting that Plaintiff Lewis was arrested for a narcotics offense, and/or linking her to the warrant or criminal history of the person wanted on that warrant from Contra Costa County.

6.     Attorney fees under 42 U.S.C. § 1983, Cal. Civ. Code §52.1, and the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq.

7.     Costs of suit;

8.     And for such other and further relief as the Court may deem proper.


Date: October 15, 2015              Respectfully submitted,

                                    *s/ Timothy A. Scott*

                                    TIMOTHY A. SCOTT
                                    NICOLAS O. JIMENEZ

                                    Law Offices of Timothy A. Scott, APC
                                    Attorneys for Plaintiff Joanne Lewis

37

COMPLAINT